UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KRISTINE WILLIAMS, et al.,           )
                                     )
                                     )
          Plaintiffs,                )        Case No.  1:24 CV 54 ACL
                                     )
     vs.                             )
                                     )
MISSOURI DEPARTMENT OF               )
CORRECTIONS, et al.,                 )
                                     )
          Defendants.                )

## MEMORANDUM AND ORDER

Plaintiff Kristine Williams has brought this action individually, and as Next Friend for

minors J.R.M., R.A.M., and Z.K.M., against Defendants Missouri Department of Corrections

("MODOC"), Bill Stange, Billy Loflin, Pierce Yount, Stephanie Noisworthy, Christy Williams,

Dr. William L. Johnson, and Cynthia A. Reese.  Plaintiffs allege state law claims of wrongful death

and medical negligence, and violations of federal law under 42 U.S.C. § 1983, related to the death

by suicide of Austen Dakota May while in the custody of MODOC.

Presently pending before the Court are the following motions: Defendant MODOC's

Motion to Dismiss Counts I and II (Doc. 26); Defendants Billy Loflin, Pierce Yount, Stephanie

Noisworthy, and Bill Stange's Motion to Dismiss Counts III and IV (Doc. 28); and Defendants

Billy Loflin, Pierce Yount, and Stephanie Noisworthy's Motion to Dismiss Count VI (Doc. 30).

These motions are fully briefed and ready for disposition.

1

## BACKGROUND[1]

Plaintiff Kristine Williams is the mother of decedent Austen Dokota May, who died on July 30, 2021, while in custody at the Southeast Correctional Center ("SECC") in Charleston, Missouri. Plaintiffs J.R.M., R.A.M., and Z.K.M. are the minor children of May.

On August 1, 2020, while housed at Fulton Reception and Diagnostic Center ("FRDC"), May was found hanging by the neck with a sheet tied to a sprinkler head. May's cellmate lifted him up and held him until staff arrived to cut him down. May survived the suicide attempt.

After the attempt, a Suicide Risk 3 ("SR3") Event Report was completed detailing May having a "difficult time" adjusting to his incarceration. He was noted to be a low to moderate risk for suicide. May was diagnosed with adjustment disorder, depression, and anxiety. He was prescribed Remeron and referred for individual and group therapy.

May was seen by a qualified mental health professional ("QMHP") on September 16, 2020, who noted that May reported that his "med[s]s [were] not working." He also reported increased anxiety. The QMHP further noted that May's symptoms "appear[ed] to be increased by his environment being in segregation." On October 31, 2020, May presented to Dr. Kaleem Syed, a psychiatrist. May reported initially doing well with his medication but not anymore, and that he was "anxious and upset…" With respect to his mood, May reported that he was "not doing good at all." Dr. Syed increased May's Remeron and recommended follow-up in four to six weeks. May met with a QMHP again on December 4, 2020, at which time he reported that

---

[1] For purposes of this motion, the Court takes the factual allegations in the Third Amended Complaint (Doc. 17) to be true. *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

2

his medications were not working.  He also reported that "his sleep is poor, [and that] he has increased AH [auditory hallucinations], hears whispers, denied commands."  May reported depression, which he rated as 5/10 and anxiety rated as 7/10.  On January 7, 2021, May requested that his medications be adjusted to help with sleep, irritability, auditory hallucinations, and anxiety.  He reported having "auditory hallucinations 'constantly' daily…sleep [was] poor and appetite vari[ed]."

On February 17, 2021, May presented to Defendant Dr. William L. Johnson, a psychiatrist at SECC, for an "Initial Evaluation."[2]  Dr. Johnson diagnosed May with "adjustment disorder with anxiety; cannabis use disorder."  May saw Defendant Cynthia A. Reese, LPC, a licensed professional counselor at SECC, on March 1, 2021, for an evaluation and review of his Individualized Treatment Plan ("ITP").  May reported that he thought he still heard voices sometimes and rated his anxiety and depression as 5/10.  Reese noted May's prior suicide attempt on August 1, 2020.  May saw Dr. Johnson on April 16, 2021, at which time he reported increased anxiety.  Dr. Johnson noted May's anxiety to be not controlled and prescribed Trazadone.  He discontinued the Remeron.  May saw a QMHP on April 23, 2021, and reported being upset about being placed in segregation.  He rated his anxiety and depression at 4/10.  At two QMHP visits in May of 2021, May reported "fear[ing] death" and that he was experiencing "high anxiety and stress" due to his mother being in an accident and not being able to talk to his family.  He reported anxiety and depression at 5/10 on June 14, 2021, and July 6, 2021.  On July 13, 2021, May complained of increased anxiety and requested adjustments to his medications.

---

[2] The Complaint does not indicate the date on which May was transferred, but he was evidently transferred from FRDC to SECC at some point prior to February 17, 2021.

3

On July 29, 2021, Defendant Bill Stange, Warden of SECC, signed a Temporary Administrative Segregation Confinement ("TASC") Order placing May in administrative segregation pending a disciplinary hearing on August 6, 2021.  The violations of which May was accused could have resulted in long-term segregation.  The TASC Order notes May was medically assessed by Defendant Christy Williams, LPN.  In her Segregation Initial Evaluation, Williams notes that May was positive for "Existing Medical/Mental Health Conditions," and that he was withdrawn and angry.  May was placed in housing unit 1, A wing, cell 113 ("cell 1A113").

Defendant MODOC maintained policies and procedures designed to address the risk of offender suicide, including Standard Operating Procedure ("S.O.P.") 12-4.1 "Suicide Intervention."  S.O.P. 12-4.1 states, in relevant part, that staff members shall be alert for "signs of potentially suicidal offenders," including the following: (1) offenders receiving information related to new or additional charges, institutional proceedings, denial of parole or pending release after a long period of incarceration; (2) offenders receiving bad news regarding themselves or family, such as a serious illness or the loss of a loved one; (3) threats of suicide attempts; (4) sad, tearful behavior or reduced emotional reactivity; and/or (5) significant changes in circumstances.  Under S.O.P. 12-4.1, if signs are identified, an offender can be placed on full or modified suicide watch, which may include placement in a cell specially designated for housing suicidal offenders.

On July 30, 2021, Defendants Billy Loflin, Pierce Yount, and Stephanie Noisworthy were working the A wing of housing unit 1.  Defendants Loflin and Yount were unit 1 wing officers; and Defendant Noisworthy was the housing unit 1 Sergeant for "A" Shift at SECC.  Defendants

4

Loflin and Yount were required to follow Post Order Number 45 (Administration Segregation

Officer-COI) ("P.O. 45"), which stated:

> Officer will make irregular, but periodic checks, with no fewer than 1 check in a 30 minute window, shall be made of all wings.  Each security check will be recorded on the chronological log when completed and initialed by staff.  You will either make a visual or verbal contact with each and every offender each time you do a security check.

Defendant Noisworthy was required to follow Post Order Number .010 HU #1 COII (Sergeant)

("P.O. 010"), which stated:

> Supervise the housing unit officers assigned to the housing unit and ensure that irregular, but periodic checks, with no fewer than 1 check in a 30 minute window, shall be made of all wings.  All staff members shall immediately report any unauthorized absences to the control center and custody staff members shall be responsible for determining the location of the offender.

At 9:20 a.m. on July 30, 2021, Corrections Classification Assistant Richard Trout had a

short interaction with the occupant of cell 1A113.  May received his noon meal tray at 10:11 a.m.

He returned his food tray to Defendant Loflin at 10:36 a.m.  Defendants Loflin and Yount

observed cell 1A113 at 11:16 a.m.  At 12:59 p.m., Defendant Yount walked near cell 1A113 and

looked toward it.  At 1:25 p.m., Defendant Loflin walked near cell 1A113 and flipped the light

switch for the cell.  At 2:18 p.m., Licensed Professional Counselor Ruth McCaherty walked by

cell 1A113.  At some point, May covered his cell door window with a paper obscuring the view

into his cell.  At 4:13 p.m., Defendant Loflin approached cell 1A113, opened the food port, and

placed May's dinner tray on the food port.  Loflin flipped the light switch for cell 1A113 and

attempted to look through the cell window.  He then removed the food tray from the food port

and a call was made over the radio to which Defendant Noisworthy responded.  Cell 1A113 was

5

opened and May was discovered hanging from what appeared to be a bed sheet tied around his neck, with the other end tied to the rear-most air vent near the ceiling of the cell.  May was pronounced dead at 5:17 p.m.

The SR3 completed as a result of May's death notes that it "coincides closely with the one year anniversary of his incarceration date…"  David Applegate, Investigator II at the Missouri Department of Corrections Office of Professional Standards, conducted an investigation into May's death.  In his report, Applegate wrote that Defendant Noisworthy was counseled regarding her "failure to supervise the officers in housing unit 1."  He stated:  "The most notable point in reviewing" video footage was that "no custody staff member assigned to housing unit 1 before the incident conducted proper security checks which involved the viewing of all offenders, especially those not in designated close observation cells, and all empty cells."  Applegate continued:

> [t]wo (2) hours and 48 minutes elapsed between the last staff interaction with either Offender May or his cell and the time he was discovered hanging.  Further, it is apparent the 'security checks' listed on the control center log were not security checks which were conducted in accordance with the established SECC post orders….

Applegate concluded that Defendants Loflin and Yount violated their post orders by failing to follow the directive contained in Post Order 45 requiring them to perform regular periodic well-being checks on May.  Applegate further concluded that Defendant Noisworthy violated her post orders by failing to follow the directive contained in Post Order .010 requiring her to ensure that the officers under her command performed regular periodic well-being checks on May.

A "Psychological Autopsy" report detailing the potential causes of May's suicide was completed on August 30, 2021, by Drs. Shirley Eyman and Elizabeth Atterberry.  The report

6

noted May may have been experiencing "hopelessness" following movement to administrative segregation and recommended staff "continue to be trained in identification of suicidal ideation and intent, and that staff remain alert to of (sic) the negative emotional consequences of segregation placement."

The Third Amended Complaint ("Complaint") asserts the following claims: (1) Counts I and II allege wrongful death claims against Defendant MODOC; (2) Count III alleges a failure to train and supervise claim under § 1983 against Defendant Stange; (3) Count IV alleges a deliberate indifference to risk of suicide claim under § 1983 against Defendants Loflin, Yount, and Noisworthy; (4) Count V alleges a deliberate indifference to risk of suicide/denial of medical care claim under § 1983 against Defendants Williams, Johnson, and Reese; (5) Count VI alleges a wrongful death claim against Defendants Loflin, Yount, and Noisworthy in their individual capacities; (6) Count VII alleges a medical negligence claim against Defendants Williams, Johnson, and Rees; and (7) Count VIII alleges a claim under R.S.Mo. § 538.210 against Defendants Williams, Johnson, and Reese.

Defendant MODOC moves to Dismiss Counts I and II of Plaintiffs' Complaint against them for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6).  (Doc. 26.)  Defendants Loflin, Yount, Noisworthy, and Stange move to dismiss Counts III and IV for failure to state a claim upon which relief can be granted and qualified immunity.  (Doc. 28.)  Finally, Defendants Loflin, Yount, and Noisworthy move to dismiss Count VI on the grounds of the public duty doctrine and official immunity.  Plaintiffs oppose the motions.

## **LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Blomker v. Jewell*, 831 F.3d 1051, 1055 (8th Cir. 2016) (quotation omitted).  The facts alleged must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  A complaint must offer more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" to state a plausible claim for relief.  *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

On a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, even if it appears that "actual proof of those facts is improbable," *Twombly*, 550 U.S. at 556, and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief. *Id.* at 555–56; Fed. R. Civ. P. 8(a)(2).  The principle that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions, however. *Iqbal,* 556 U.S. at 678 (stating "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").  Although legal conclusions can provide the framework for a complaint, they must be supported by factual allegations. *Id.*

## DISCUSSION

As previously noted, three separate Motions to Dismiss are pending.  The undersigned will address the Motions in turn.

### I.    Motion to Dismiss Counts I and II

Defendant MODOC argues that Counts I and II should be dismissed on the ground of sovereign immunity.

Under Missouri statute, "public entities are generally immune from suits for their negligent acts."  *Gilmore v. Missouri Dep't of Soc. Servs., Children's Div.*, 658 S.W.3d 146, 152 (Mo. Ct. App. 2022).  *See* Mo. Rev. Stat. § 537.600.1 (tort immunity in effect unless specifically waived).  "[S]tatutory provisions waiving sovereign immunity must be strictly construed." *Richardson v. State Hwy & Transp. Com'n*, 863 S.W.2d 876, 880 (Mo. banc 1993).  Plaintiffs must "plead facts sufficient to allege a waiver of sovereign immunity ...."  *Brennan By & Through Brennan v. Curators of the Univ. of Missouri*, 942 S.W.2d 432, 437 (Mo. Ct. App. 1997).

Plaintiffs argue that the "dangerous condition" exception strips MODOC of sovereign immunity.

A public entity waives immunity under § 537.600 if the injury complained of arises from the negligent operation of a motor vehicle or a dangerous condition of property.  *State ex rel. Board of Trustees of City of North Kansas Memorial Hosp. v. Russell,* 843 S.W.2d 353, 358 (Mo. 1992).  To benefit from the statutory waiver [regarding dangerous conditions] set out in § 537.600.1(2), [Plaintiffs are] required to prove four elements: (1) that the property was in

dangerous condition at the time of the injury, (2) that the injury directly resulted from the dangerous condition; that is, that the dangerous condition was the proximate cause of the injury, (3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury that was incurred; and (4) that a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition. *Hensley v. Jackson County,* 227 S.W.3d 491, 496 (Mo. banc 2007) (internal citations omitted); Mo. Rev. Stat. § 537.600.1(2).

Plaintiffs contend that MODOC's facility was in a dangerous condition at the time of May's death in that MODOC:

> maintained a defective video monitoring system on its property that it knew or should have known failed to appropriately display areas wherein prisoners needed to be monitored, maintained a defective mechanism for monitoring at-risk detainees in their cells, maintained an obstruction to the viewing window to Decedent's cell (i.e., the paper obscuring the viewing window), was inadequately staffed, and/or defendant MODOC's employees were not adequately trained and supervised with respect to suicide prevention, medical management of detainees, identification of at-risk detainees, intake and personal property management, and detainee monitoring.

(Doc. 13-1 at 12-13.)  Plaintiffs allege that May's death directly resulted from the dangerous conditions and the dangerous conditions created an unreasonable and foreseeable risk of harm of the kind suffered by May.  *Id.* at 13.  The Complaint alleges that the negligent acts of one or more of MODOC's employees, including Defendants Stange, Loflin, Yount, Harris, and/or Noisworthy acting within the course and scope of their employment, created the dangerous condition in the following ways: (1) negligently failing to adequately train employees in the areas of suicide prevention, proper detainee monitoring, proper identification of at-risk detainees,

intra-office communication to ensure proper coverage for detainee monitoring, adequate staffing, and/or well-being checks; (2) negligently failing to enforce compliance with departmental policies in the areas of suicide prevention, proper detainee monitoring, proper identification of at-risk detainees, intra-office communication to ensure proper coverage for detainee monitoring, adequate staffing, and/or well-being checks; (3) negligently failing to adequately staff the facility in which May was housed; (4) negligently failing to arrange for persons or CO conduct wellness checks on May; and/or (5) negligently failing to conduct well-being checks on May periodically, not no less than once in a 30-minute window.  *Id.* at 13-14.

Defendants argue that the Complaint does not satisfy the dangerous conditions exception because Plaintiffs do not allege anything about May's holding cell that was dangerous.  Rather, Defendants contend that Plaintiffs allege that the conduct of the officers, in failing to monitor May, caused May's death.

"Dangerous public property within § 537.600.1(2)'s narrow exception 'must exhibit a defect that is physical in nature.'"  *Lackey v. Iberia R-V Sch. Dist.*, 487 S.W.3d 57, 59 (Mo. Ct. App. 2016) (quoting *Boever v. Special Sch. Dist. of St. Louis Cnty.*, 296 S.W.3d 487, 493 (Mo. Ct. App. 2009)).  This defect can be in the property itself or due to the positioning of the property.  *State ex rel. City of Marston v. Mann*, 921 S.W.2d 100, 102 (Mo. App. 1996).  Thus, "[t]he dangerous condition alleged 'must describe, define, explain, denote or reference only and exclusively the physical defects in, upon and/or attending to the property of the public entity.'"  *J.M. v. Lee's Summit Sch. Dist.*, 545 S.W.3d 363, 369 (Mo. App. 2018) (quoting *Russell*, 91 S.W.3d at 616) (citation and internal punctuation omitted).

Defendants argue that Plaintiffs' dangerous condition allegations amount only to a failure to supervise claim, which cannot "constitute a dangerous 'condition' of the 'property' for purposes of waiving sovereign immunity." *State ex rel. Div. of Motor Carrier & R.R. Safety v. Russell*, 91 S.W.3d 612, 616 (Mo. banc 2002); *see also Necker v. City of Bridgeton*, 938 S.W.2d 651, 655 (Mo. Ct. App. 1997).

Plaintiffs respond that Defendants ignore the plain language of their Complaint, which pleads that May's death was caused by a "defective video monitoring system on its property that it knew or should have known failed to appropriately display areas wherein prisoners needed to be monitored" and/or that May's death was caused by the "obstruction to the viewing window to Decedent's cell…" (Doc. 37 at 7.) They rely upon *Betts v. Jackson County, Missouri*, No. 4:21-cv-00023-DGK, 2022 WL 605620 (W.D. Mo. March 1, 2022), in support of their proposition that May's suicide did not preclude liability because it was a foreseeable product of Defendant's negligence.

In *Betts*, the plaintiff pre-trial detainee brought a negligence action against Jackson County based on premises liability for failing to equip the Jackson County Detention Center with adequate surveillance cameras and cell door locks after the plaintiff was attacked by other inmates in his cell. The Court first rejected the defendant's argument that the plaintiff failed to plead facts alleging a defective condition of the property, noting plaintiff's allegation that inmates were able to obtain access to his cell because of "faulty door locks and because of poor placement of security cameras and/or the fact that security cameras and monitors were not working." *Id.* at *11. The defendants next argued that the plaintiff failed to plead that his injury

12

directly resulted from a dangerous condition because the other inmates were the actual cause of his injury.  The Court noted that "an intervening cause, even a criminal act, 'will not preclude liability where it is itself a foreseeable and natural product of the original negligence.'"  *Id.* at *12 (quoting *Thompson v. City of St. Joseph*, 597 S.W.3d 687, 689 (Mo. Ct. App. 2019)).  The Court held as follows:

> Door locks and security cameras are installed in jails not only to keep inmates from escaping, but also to protect inmates' safety from attack by other inmates. In this case, the assault on Plaintiff was a foreseeable and natural product of faulty door locks and of non-working and poorly placed security cameras.  As such, Plaintiff has sufficiently pled the second element of a dangerous condition exception to Jackson County's sovereign immunity.

*Id.*

 Here, the Complaint alleges that dangerous conditions—a defective video monitoring system and/or an obstruction to the viewing window to May's cell—caused May's death.  As such, Plaintiffs have adequately pled the first element of the dangerous condition exception to sovereign immunity.

The Court further finds that Plaintiffs have sufficiently pled the second element—that May's injury resulted from the dangerous conditions.  The Complaint alleges May had previously attempted suicide and underwent an SR3 Event Report.  Defendant MODOC maintained policies designed to address inmate suicide, therefore implicitly recognizing the problem and risk of inmate suicide.  Plaintiffs allege that Defendants Loflin and Yount failed to conduct checks at least every thirty minutes in accordance with P.O. 45.  These facts sufficiently allege that May's suicide was a foreseeable and natural product of an obstructed cell window and of non-working or poorly placed security cameras.

It is noteworthy that in the cases relied upon by Defendant MODOC address the merits of the trial court's grant of summary judgment, which is a more substantive consideration than a dismissal for failure to state a claim. *See Maune v. City of Rolla*, 203 S.W.3d 802 (Mo. Ct. App. 2006) (summary judgment in favor of City of Rolla); *Necker*, 938 S.W.2d at 651 (summary judgment in favor of City of Bridgeton).

Here, giving Plaintiffs the benefit of all favorable inferences, Plaintiffs sufficiently pleaded allegations to satisfy each element of the dangerous condition exception to sovereign immunity. Thus, Plaintiffs sufficiently state a claim under the dangerous condition exception to sovereign immunity.

Accordingly, Defendant MODOC's Motion to Dismiss Counts I and II will be denied.

## II.    Motion to Dismiss Counts III and IV

Defendants Loflin, Yount, Noisworthy, and Stange move to dismiss Counts III and IV of the Complaint on the grounds of failure to state a claim and qualified immunity. Defendants first argue that Count IV should be dismissed because Loflin, Yount, and Noisworthy are entitled to qualified immunity. They next argue that Counts III and IV fail to state proper official capacity claims under 42 U.S.C. § 1983. The undersigned will address these claims in turn.

### A.    Count IV

Count IV alleges a deliberate indifference to risk of suicide claim under 42 U.S.C. § 1983 against Defendants Loflin, Yount, and Noisworthy. Plaintiffs allege that Defendants knew or could have inferred that May was a suicide risk in light of the multitude of signs he exhibited of being a suicidal offender both in the lead up to, and following, his placement in administrative

14

segregation.  (Doc. 13-1 at 19.)  Plaintiffs allege that, despite this knowledge, Defendants failed to take adequate measures to prevent May's suicide by (among other things) violating their Post Orders during the period they were assigned to monitor May.

Defendants argue that Loflin, Yount, and Noisworthy did not act with deliberate indifference toward May's risk of suicide and are entitled to qualified immunity.

## 1. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "To prevail against a claim of qualified immunity, a plaintiff must show (1) that the facts alleged or shown by the plaintiff make out a constitutional violation, and (2) that the constitutional right allegedly violated was 'clearly established.'" *Swearingen v. Judd*, 930 F.3d 983, 987 (8th Cir. 2019) (quoting *Pearson*, 555 U.S. at 232).  The Court may address either question first. *Pearson*, 555 U.S. at 236.

Because the Court is addressing the issue of qualified immunity in a motion to dismiss, the answers to these two questions are entirely dependent upon what Plaintiffs allege in the Complaint.  *See Dornheim v. Sholes*, 430 F.3d 919, 926 (8th Cir. 2005) ("A rule 12(b)(6) dismissal based on qualified immunity is appropriate 'when the immunity is established on the face of the complaint.'") (quoting *Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997)).  Thus, to prevail on their Motion to Dismiss based on qualified immunity, Defendants "must

show that they are entitled to qualified immunity on the face of the complaint." *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005).

### 2. Deliberate Indifference

The Eighth Amendment requires prison officials to provide inmates with medical care. *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (internal citations and quotations omitted).

"A plaintiff claiming deliberate indifference must establish objective and subjective components." *Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013) (citing *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009)). "The objective component requires a plaintiff to demonstrate an objectively serious medical need," while "[t]he subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." *Id.* (citing *McRaven*, 577 F.3d at 980). "Deliberate indifference is 'akin to criminal recklessness,' something more than mere negligence; a plaintiff must show that a prison official 'actually knew that the inmate faced a substantial risk of serious harm' and did not respond reasonably to that risk." *A.H. v. St. Louis County*, 891 F.3d 721, 726 (8th Cir. 2018) (quoting *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

The Eighth Circuit has recognized that a risk of suicide by an inmate is a serious medical need. *See Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000) (citing *Rellergert v. Cape Girardeau County*, 924 F.2d 794 (8th Cir. 1991)).

16

Accepting the factual allegations in Plaintiffs' Complaint as true and viewing all reasonable inferences in Plaintiffs' favor, the Court finds Plaintiffs sufficiently allege a violation of May's constitutional right to be free from deliberate indifference to a serious medical need. First, Plaintiffs have sufficiently alleged an objectively serious medical need. A "serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). In this case, Plaintiffs assert that May was mentally unstable and suicidal, as evidenced by his prior attempted suicide by hanging in August of 2020, almost a year to the date of his successful suicide attempt; his symptoms were noted to be increased from being in isolation; he continually reported anxiety and depression; he reported auditory hallucinations on more than one occasion; he reported "high anxiety and stress" due to his mother being in an accident; and an upcoming administrative hearing could have resulted in long-term segregation.

Second, Plaintiffs have sufficiently alleged that Defendants knew of or could have inferred that May was a suicide risk. Plaintiffs note that Defendant MODOC issued a departmental set of suicide risk factors in S.O.P. 12-4.1 with the express intent of raising the awareness of its officers and employees to factors in inmates' lives within SECC that could increase the risk of suicide. They argue that May unquestionably exhibited at least one of those risk factors of which all Defendants must have been aware: "institutional proceedings" or "a significant change in circumstances," represented by May's placement in Administrative Segregation pending an administrative hearing that could have resulted in long-term segregation.

17

Finally, Plaintiffs sufficiently allege that Defendants deliberately disregarded May's serious medical need.  Plaintiffs allege that, despite being aware of May's risk to suicide, Defendants intentionally left May alone and unmonitored in his cell for a period of almost three hours.

Turning to the second step of the inquiry, the constitutional right asserted by the Plaintiffs is clearly established.  *Stewart v. Wagner*, 836 F.3d 978, 986 (8th Cir. 2016) ("We do not require a case directly on point before concluding the § 1983 defendant violated clearly established law, but existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotation marks omitted).  Case law firmly establishes that a pretrial detainee has the right to be free from deliberate indifference to his substantial suicide risk and from deliberately indifferent denials of emergency medical care.  *A.H. v. St. Louis County*,  No. 4:14-CV-2069-CEJ, 2015 WL 4426234, at *2 (E.D. Mo. July 17, 2015) (citing *Coleman*, 349 F.3d at 538); *Ryan*, 850 F.3d at 427.

In sum, Plaintiffs sufficiently allege Defendants' knowledge of the risk to May and that they failed to reasonably act, and the Court determines that Defendants are not entitled to qualified immunity on the face of the Complaint as to Count IV.  The truth of the Defendants' actual knowledge of the substantial risk of harm, and their deliberate indifference to it, is best determined after the benefit of discovery.

Thus, Defendants' Motion to Dismiss will be denied as to Count IV.

### B.    Count III

Count III alleges a failure to train and supervise claim under 42 U.S.C. § 1983 against

18

Defendant Stange.  Plaintiffs allege that Defendant Stange deprived May of his constitutionally protected liberty rights by being deliberately indifferent to the need to supervise and train his employees in the areas of suicide prevention, proper detainee monitoring, proper identification of at-risk detainees, intra-office communication to ensure proper coverage for detainee monitoring, adequate staffing, and/or well-being checks.  They claim that a review of May's treatment while being detained at SECC "makes it clear that the need for more or different training was so obvious, and the inadequacy of the involved Defendants' training was so likely to result in the violation of constitutional rights, that defendant Stange can reasonably be said to have been deliberately indifferent" to the need to provide more training and supervision of the involved Defendants.  (Doc. 17 at 18.)

Defendants argue that Count III does not show a pattern of constitutional violations committed by subordinate officers Yount, Loflin, and Noisworthy, nor does it state facts showing that Stange had notice that suicide prevention training was inadequate.

Plaintiffs respond by pointing to the investigation into the circumstances leading up to May's death conducted by Investigator Applegate, which found that all three of the individually-named officers violated their Post Orders by failing to conduct periodic well-being checks on May.   Plaintiffs argue that some of the findings in the report suggest broader violations, in that Applegate wrote that "[t]he most notable point in reviewing [the security camera footage was] that *no custody staff member assigned to housing unit 1* before the incident conducted proper security checks which involved the viewing of all offenders, especially those not in designated close observation cells…"   (Doc. 13-1 at 11) (emphasis added).  Plaintiffs note that Applegate

19

also found that "security checks" documented by officers as having been performed were not conducted in conformance with departmental policy.  Specifically, Applegate stated:

> [t]wo (2) hours and 48 minutes elapsed between the last staff interaction with either Offender May or his cell and the time he was discovered hanging.  Further, ***it is apparent the 'security checks' listed on the control center log were not security checks which were conducted in accordance with the established SECC post orders***….

*Id.*

Plaintiffs argue that Applegate's statements suggest that for "some unknown period of time prior to Decedent's suicide," corrections officers were not performing regular security checks in accordance with policy, and that officers were falsifying entries on the control center logs to make it appear as though they had properly performed their checks.  They contend that these failures were either occurring with the consent of management or management was turning a blind eye to the deficiencies in the checks.  Plaintiffs argue that the details of the training received by Defendants Yount, Loflin, and Noisworthy with respect to the performance of P.O. 45 checks, the frequency with which the failure to perform checks was occurring, and the extent to which these failures were brought to the attention of Defendant Stange should be the subject of discovery.

Defendants filed a Reply, in which they argue that Plaintiffs' argument that corrections officers falsified the logs documenting their security checks was not included in the Complaint. (Doc. 44.)  Because a plaintiff may not amend a complaint through the filing of a brief in response to a motion to dismiss, Defendants argue that this allegation should by disregarded by the Court.

20

A supervisor is liable under § 1983 if he or she directly participates in a constitutional violation or "if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996). "A failure-to-supervise claim may be maintained only if the official demonstrated deliberate indifference or tacit authorization of the offensive acts." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (quotation marks and citations omitted). "This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Andrews*, 98 F.3d at 1078.

In other words, "[w]hen a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaun*, 808 F.3d 335, 340 (8th Cir. 2015) (citing *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012)). "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *S.M.*, 808 F.3d at 340.

At the motion to dismiss stage, a plaintiff need not "plead the existence of an unconstitutional policy or custom." *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003). But "[a]t a minimum, the complaint must allege facts which would support the existence of an unconstitutional policy or custom." *Id.* Supervisory liability will

ordinarily not be imposed based upon a "single incident, or a series of isolated incidents." *Howard v. Adkinson*, 887 F.2d 134, 138 (8th Cir. 1989).

The Court agrees with Defendants that the Complaint does not allege a pattern of unconstitutional acts committed by officers. The allegation that the need for more training and the inadequacy of the involved officers' training was "so obvious" that May can reasonably be said to have been deliberately indifferent to the need is a mere legal conclusion. (Doc. 17 at 18.) Moreover, the Complaint does not make the specific allegation that Defendants "falsified" security logs.

The Court, however, notes that "[w]hen a complaint is filed, a plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right." *Doe*, 340 F.3d at 614. This observation is particularly true where, as here, Plaintiffs are suing on behalf of a deceased inmate and are therefore even further removed from the policies and customs of MODOC. In turn, while the Complaint at this time does not allege a pattern of unconstitutional conduct, the allegations do not entirely foreclose the possibility that a policy, practice, or unofficial custom of unconstitutional conduct could be found during discovery. The findings of Applegate set out in the Complaint, particularly the statement that the "security checks" listed on the logs were not in fact security checks, supports the implication that some type of falsification of records occurred for an unknown length of time. Thus, Count III will be dismissed without prejudice.

### III.    Defendants' Motion to Dismiss Count VI

In Count VI, Plaintiffs assert a wrongful death claim against Defendants Loflin, Yount,

and Noisworthy in their individual capacities.  They allege that Defendants Loflin and Yount should have known that May's condition created a substantial risk May would harm himself and breached their non-discretionary duty to May by negligently failing to conduct well-being checks on May in conformance with Post Order Number 45.  Plaintiffs allege Defendant Noisworthy breached her non-discretionary duty to May by negligently failing to supervise the unit officers to ensure that irregular, but periodic, checks with no fewer than 1 check in a 30-minute window were made in conformance with Post Order Number .010.

Defendants argue that Count VI should be dismissed on the grounds of the public duty doctrine and official immunity.

## A.  Public Duty Doctrine

Under the public duty doctrine, "a public employee is not liable to an individual for injuries resulting from a breach of duty the employee owes only to the general public." *Est. of Snyder v. Julian*, 789 F.3d 883, 887-88 (8th Cir. 2015) (citing *Southers v. City of Farmington*, 263 S.W.3d 603, 611 (Mo. 2008)).  The public duty rule is based on the absence of a duty to the particular individual, as contrasted to the duty owed to the general public.  *Southers*, 263 S.W.3d at 611.  A "public duty" is "the 'kind of duty owed to the public at large,' and is the kind of duty that requires the public official to use discretion, including 'professional expertise, training and judgment.'" *Gregg v. City of Kansas City*, 272 S.W.3d 353, 362 (Mo. Ct. App. 2008) (citing *Davis-Bey v. Mo. Dep't of Corr.*, 944 S.W.2d 294, 298 (Mo. Ct. App. 1997)).

Defendants cite *Cooper v. Planthold*, 857 S.W.2d 477 (Mo. Ct. App. 1993), to support their argument that the duties owed by Defendants to May were owed to the public at large and

not to May personally.  *Cooper* concerned the liability of a booking officer who failed to confiscate an arrestee's suspenders, which the arrestee later used to hang himself.  *Id.* at 478. Significantly, the decedent "had given no indication at the time of the arrest or search that he might attempt suicide."  *Id.*  The arrestee's father filed suit, claiming that the booking officer was negligent in failing to follow departmental procedures mandating the removal of personal property.  *Id.* at 478-79.  The appellate court concluded that the public duty doctrine applied because the personal property removal policy had several public policy rationales, including the protection of the prisoner and others in custody, as well as preventing litigation over lost property.  *Id.* at 480.  There was no evidence that the order was promulgated to personally protect particular individuals.  *Id.*

Plaintiffs respond that Defendants ignore later Missouri Supreme Court precedent at odds with *Cooper's* holding, particularly *Jungerman v. City of Raytown,* 925 S.W.2d 202, 205 (Mo. banc 1996) (internal quotations and citations omitted), *abrogated on other grounds by Southers v. City of Farmington,* 263 S.W.3d 603 (Mo. banc 2008).  Plaintiffs further argue that subsequent precedent supports the proposition that public duty immunity does not lie where injury to a particular individual is reasonably foreseeable.

In *Jungerman*, the Missouri Supreme Court held that an officer was not shielded from liability by the public duty doctrine when an arrestee's Rolex watch was stolen due to the officer's failure to immediately inventory and store the property.  925 S.W.2d at 205.  The Court stated:

> A duty is owed to particular individuals for the performance of ministerial duties in which a private individual has a special, direct, and distinctive interest. Such an interest exists when injury to a particular, identifiable individual is reasonably

foreseeable as a result of an official's breach of duty. Whether an individual has such a private interest depends on the facts of each case, not on broad pronouncements about the usual status of relevant functions. Finally, it cannot be assumed that a duty is private simply because it is ministerial.

*Id.* (internal quotations and citations omitted).  The court then distinguished the case from others where duties were owed only to the public as a whole; for example, the failure to enforce gambling laws and the failure to take safety measures at public swimming areas.  *Id.*

Here, Plaintiffs allege that Defendants breached their duty to May to prevent his suicide by failing to monitor May.  They contend that May's suicide was a reasonably foreseeable consequence of Defendants' failure to monitor him in light of his display of suicidal behavior. As a result, the public duty doctrine does not mandate dismissal at this stage.  *See Teague v. St. Charles Cnty.,* 708 F. Supp.2d 935, 940 (E.D. Mo. 2010) (declining to find the public duty doctrine applied as a defense to plaintiff's negligence claim for prematurity on a motion to dismiss).

## B.  Official Immunity

Defendants further assert that Loflin, Yount, and Noisworthy are entitled to official immunity.

"Under Missouri law, the doctrine of official immunity protects public officials from civil liability for injuries arising out of their discretionary acts or omissions performed in the exercise of their official duties."  *McLean v. Gordon,* 548 F.3d 613, 617 (8th Cir. 2008) (quoting *James ex rel. James v. Friend,* 458 F.3d 726, 731 (8th Cir. 2006)).  "Official immunity does not, however, shield officials for liability arising from their negligent performance of ministerial acts or functions."  *Id.*  Discretionary acts require "the exercise of reason in the adaption of means to

an end and discretion in determining how or whether an act should be done or pursued." *Rustici v. Weidemeyer,* 673 S.W.2d 762, 769 (Mo. banc 1984) (quoting *Jackson v. Wilson,* 581 S.W.3d 39, 43 (Mo. Ct. App. 1979)).  A ministerial act, in contrast, is one "of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed."  *Id.*

The analysis of the act in question "must be determined by the facts of each particular case after weighing such factors as the nature of the official's duties, the extent to which the acts involve policymaking or the exercise of professional expertise and judgment, and the likely consequences of withholding immunity."  *Kanagawa v. State,* 685 S.W.2d 831, 836 (Mo. banc 1985).

Defendants argue that the duties allegedly breached in this case were discretionary and not clerical.  They contend that Loflin and Yount's post orders to conduct "irregular, but periodic" checks vested them with discretion in how to carry out the checks.  Regarding Defendant Noisworthy, Defendants argue that her responsibilities were supervisory and therefore called for discretion.

Plaintiffs respond that Defendants' responsibility to perform regular checks "at a prescribed interval" (*i.e.*, no fewer than one check every thirty minutes), was ministerial and not discretionary.  *Letterman v. Does*, 859 F.3d 1120, 1126-27 (8th Cir. 2017).

In *Letterman*, parents of a deceased state prisoner sued correctional officers for the wrongful death of their son after he died while on suicide watch.  The prison facility had in place

a close observation policy, which required officers to check on a subject prisoner every fifteen minutes, record their observations in a close observation log, and report a medical emergency if, during a check, the officers "could not observe movement, obtain a verbal response, or see breathing." *Id.* at 1123.  The correctional officers in *Letterman* argued they were protected from liability by official immunity because compliance with the prison facility's policies required exercise of discretion to determine if a prisoner's non-responsiveness was due to sleep or a medical emergency.  *Id.* at 1126.  The Eighth Circuit disagreed and held that the correctional officers were not entitled to official immunity because their failure to follow the institution's close observation policies constituted a ministerial duty.  *Id.* at 1126-1127.  The Court noted that policy required the officers "to observe the inmate and obtain a response at a prescribed interval," which "confers no policymaking authority and requires no professional judgment."  *Id.* at 1126.  *See also Bouton v. Missouri*, No. 2:22-CV-00010-SPM, 2023 WL 402018, at *8 (E.D. Mo. Jan. 25, 2023) (relying on *Letterman* to find that a "failure to monitor an inmate and/or take action in response to the required monitoring may, under some circumstances, be a ministerial duty").

Here, taking Plaintiffs' alleged facts as true, the Court finds that Plaintiffs have sufficiently alleged that Defendants were acting in a ministerial capacity when failing to conduct the prescribed checks every thirty minutes.  The test for whether an act is "discretionary" or "ministerial" is fact-intensive, and, again, the determination of this issue cannot be made at this stage in the proceedings.  *See Teague,* 708 F. Supp.2d at 940–41 (declining to find that defendants were entitled to official immunity to plaintiff's negligence claim for prematurity on a

motion to dismiss).

Thus, the Court will deny Defendants' Motion to Dismiss Count VI.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant MODOC's Motion to Dismiss Counts I and II (Doc. 26) is **denied**.

**IT IS FURTHER ORDERED** that Defendants Billy Loflin, Pierce Yount, Stephanie Noisworthy, and Bill Stange's Motion to Dismiss Counts III and IV (Doc. 28) is **granted in part and denied in part**.  The Motion is **denied as to Count IV** and the Motion is **granted in that Count III is dismissed without prejudice**.

**IT IS FURTHER ORDERED** that Defendants Billy Loflin, Pierce Yount, and Stephanie Noisworthy's Motion to Dismiss Count VI (Doc. 30) is **denied**.

Dated this 8th day of January, 2025.

s/*Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE